**FERRO CORPORATION, Plaintiff,**

v.

**COOKSON GROUP, et al., Defendants.**

**No. 1:06CV3070.**

United States District Court,
N.D. Ohio,
Eastern Division.

April 11, 2008.

Brian E. Roof, Gregory R. Farkas, M. Neal Rains, Barbara J. Arison, James B. Niehaus, Frantz Ward, Cleveland, OH, for Plaintiff.

Lisa Kimmel, Roxann E. Henry, Howrey, Washington, DC, Maria A. Del Monaco, Melissa L. Zujkowski, Michael N. Ungar, Ulmer & Berne, Cleveland, OH, for Defendants.

## MEMORANDUM OPINION AND ORDER

SARA LIOI, District Judge.

This matter is before the Court on cross-motions for summary judgment. Plaintiff Ferro Corporation ("Ferro" or "Plaintiff") filed a motion for partial summary judgment (Doc. No. 55), seeking a determination that it is entitled to recover on its claim that Defendants Cookson Group plc, Cookson America, Inc., and Cookson Investments, Inc., (collectively, "Cookson" or "Defendants") breached their duty to defend and indemnify Ferro. Cookson opposed Ferro's motion for partial summary judgment, and filed its own motion for summary judgment (Doc. No. 54), asserting that it is entitled to judgment in its favor on each of Ferro's claims. Both motions have been briefed fully, and are ripe for decision.[1]

## I. Statement of Facts and Procedural Background

Ferro produces and sells chemical products, including plastic additives. On or about October 25, 1995, Ferro entered into an Asset Purchase Agreement (the "APA") whereby Ferro acquired certain assets of Synthetic Products Corporation ("Synpro"), including Synpro's plastic additives business. (Compl. ¶ 14.)[2] At the time of the APA, Synpro was a subsidiary or affiliate of Cookson. Ferro had engaged independently in the plastic additives business since at least the 1980s, and its acquisition of Synpro's assets supplemented that segment of its existing business. What was left of Synpro remained a part of the Cookson corporate family.

The APA provided that Synpro retained "all liabilities and obligations, whether or not associated with the Business, whether accrued, absolute, contingent, known or unknown, that are not expressly assumed by [Ferro under the APA]." (Defs.' Mot. for Summ. J., Ex. 2 at 5, § 1.4.) The APA further provided that Ferro assumed "no liabilities or obligations of [Synpro], wheth-

---

1. Both Ferro and Cookson filed motions for leave to file additional briefs. (Doc. Nos. 66 & 67, respectively.) Both motions are **GRANTED.**

2. All references herein to the Complaint, unless otherwise noted, are to the Amended Complaint, filed June 15, 2007. (Doc. No. 17.)

er such liabilities are or may be direct or indirect, absolute or contingent, or relating to the Business [ . . . ]." (*Id.*, § 1.5.)

Section 12.2 of the APA entitled "Indemnification by Cookson and [Synpro]" provided, in pertinent part, that

> Cookson and [Synpro], jointly and severally, shall hold harmless, indemnify and defend [Ferro] and permitted successors and assigns from and against any loss, claim, cause of action or liability, cost or expense including, without limitation, fines, penalties, court costs and reasonable attorneys' fees, consultants' fees, disbursements and expenses, that arise out of:
>
> a. Retained Liabilities. All Retained Liabilities of [Synpro] not expressly assumed by [Ferro] pursuant to Section 1.5;

(*Id.* at 61.)

In May 2003, Ferro revealed in a Securities and Exchange Commission filing that it had received a request for production of documents from the United States Department of Justice regarding an investigation into possible antitrust violations in the plastic additives [3] industry. Shortly thereafter, Ferro was named as a defendant in four civil antitrust lawsuits (collectively the "Antitrust Cases").[4] Plaintiffs in the Antitrust Cases (the "Antitrust Plaintiffs") alleged that Ferro and the other defendants engaged in a price-fixing conspiracy, allocated customers and markets, and committed other unlawful practices designed to raise, maintain and/or stabilize prices artificially for plastic additives. (Compl.¶ 11.) According to the Antitrust Plaintiffs, this alleged conspiracy existed and continued from January 1990 through January 2003. (*Id.*) Neither Cookson nor Synpro was named as a defendant in any of the Antitrust Cases, nor do their names appear in the allegations of the complaints in those cases. (*See* Pl.'s Mot. for Partial Summ. J., Ex. F.) Ferro has since expended significant sums defending the Antitrust Cases, and paid millions of dollars to settle two of the cases.[5]

More than three years after the filing of the first of the Antitrust Cases,[6] on September 22, 2006, Ferro's Vice President and General Counsel James Bays sent a letter to Cookson demanding that Cookson defend and indemnify Ferro in the Antitrust Cases pursuant to the APA. (Defs.' Mot. Summ. J., Ex. 7.) In the demand letter, Ferro asserted that it had learned that the allegations against Ferro in the Antitrust Cases were based in part upon activities of Synpro that occurred before its acquisition by Ferro. Specifically, the demand letter referenced an inquiry [7] by

---

**3.** The terms "plastic additives" and "heat stabilizers" apparently are used interchangeably by the parties, such that the "heat stabilizer" industry and the "plastic additives" industry are, for purposes of this action, identical. For purposes of clarity and consistency, the Court refers to the industry in question exclusively as the "plastic additives" industry.

**4.** Three of these lawsuits currently are pending in the United States District Court for the Eastern District of Pennsylvania. The fourth is pending in a California state court.

**5.** Ferro has incurred in excess of $2,900,000 in legal fees and expenses related to the Antitrust Cases. (Bays Aff., ¶¶ 2–4.) Ferro paid $750,000 to settle the PolyOne Litigation, and $5,500,000 to settle the Direct Purchaser Litigation. (Niehaus Aff. ¶ 9; Kaplan Aff. ¶ 9.)

**6.** The Complaint in the Direct Purchaser Litigation was filed on March 28, 2003.

**7.** In Ferro's letter to Cookson requesting defense and indemnification, Ferro refers to this as a "claim" (rather than an inquiry) by the Antitrust Plaintiffs. Having reviewed the underlying record from the Antitrust Cases, for the reasons explained herein, it is clear to the Court that the Antitrust Plaintiffs never asserted any claim based on allegations of a meeting between Jennings and Jain, but merely inquired as to whether such a meeting occurred.

the Antitrust Plaintiffs as to whether Synpro President Tom Jennings had a meeting with Nirmal Jain of Chemtura Corporation in 1993. (*Id.*) Jain subsequently invoked his Fifth Amendment privilege against self-incrimination at his deposition taken in the Antitrust Cases,[8] and Jennings declined to discuss his involvement in the industry when contacted by Ferro's counsel.[9]

Ferro filed this lawsuit against Cookson on December 22, 2006, claiming breach of contract and seeking a declaration that Cookson is required, pursuant to the APA, to defend and indemnify Ferro for any and all liabilities arising out of the Antitrust Cases resulting from conduct of Synpro that occurred before October 31, 1995. (Doc. No. 1.) Ferro filed an amended complaint on June 15, 2007. (Doc. No. 16.) According to Ferro, the allegations against it in the Antitrust Cases are based, at least in part, upon activities of employees or agents of Synpro. (Compl. ¶ 15.) Ferro also contends that the Antitrust Plaintiffs have taken the position that Ferro's part in the alleged antitrust conspiracy is founded partially upon conduct of Synpro during the alleged conspiracy period. (*Id.*)

Cookson filed a motion for judgment on the pleadings on July 16, 2007, asserting that even if Ferro proved all the allegations in the amended complaint, it would not be entitled to the relief sought. (Doc. No. 20.) Specifically, Cookson contended in its motion for judgment on the pleadings that the joint and several nature of antitrust liability for the conduct of coconspirators meant that any liability Ferro faced as a defendant in the Antitrust Cases existed without regard to the liabili-

ty of coconspirators, whether named or unnamed. Ferro opposed Cookson's motion (Doc. No. 21), and Cookson replied. (Doc. No. 24.) On December 14, 2007, the Court informed the parties that it was converting Cookson's motion for judgment on the pleadings to one for summary judgment, and permitted the parties to supplement the record and file additional briefing. Filing of the instant motions ensued. The matter has been briefed fully and is ripe for decision.

## II. Law and Analysis

### A. Standard of Review

Fed.R.Civ.P. 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law [ . . . ].

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein [ . . . ]. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and sup-

---

8. Jain's assertion of the privilege was by no means limited to questions relating to a meeting with Jennings. The portion of his deposition placed on the record reflects that Jain invoked his Fifth Amendment rights with respect to nearly all questions asked of him. The extent to which this was reported to Cookson when the request for defense and indemnification was made is not clear.

9. Ferro noticed the deposition of Jennings in this action, but canceled it. (Defs.' Mot. for Summ. J., Ex. 11.)

ported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (*citing Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C.Cir.1988)). Rather, the nonmoving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir.2001). The non-movant must show more than a scintilla of evidence to overcome summary judgment, *Street*, 886 F.2d at 1477; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## B. Count I—Breach of Contract

### 1. Contract Analysis

The APA that is the source of Ferro's claims in this case is a contract. Construction of a contract is a question of law. "In construing the terms of a written contract, the primary objective is to give effect to the intent of the parties, which [ ... ] rests in the language that they have chosen to employ." *In re All Kelley & Ferraro Asbestos Cases*, 104 Ohio St.3d 605, 613, 821 N.E.2d 159 (2004) (citations omitted). When the parties' agreement is integrated into an unambiguous written contract, courts give effect to the plain meaning of the parties' expressed intentions. *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*,

46 Ohio St.3d 51, 53, 544 N.E.2d 920 (1989) (citations omitted).

The APA required Cookson to defend and indemnify Ferro for any claim arising out of retained liabilities of Synpro not expressly assumed by Ferro. The parties agree that Ferro did not expressly assume any liability of Synpro based upon actual or alleged antitrust violations that occurred prior to Ferro's purchase of the Synpro assets, which closed on October 31, 1995. Thus, Cookson was required, pursuant to the APA, to defend and indemnify Ferro in the event a claim or cause of action was leveled at Ferro which arose out of actual or alleged conduct of Synpro occurring on or before October 31, 1995. Ferro itself was sued for antitrust violations by the Antitrust Plaintiffs in the Antitrust Cases. The pertinent question is whether the claims in the Antitrust Cases arose out of actual or alleged pre-APA conduct of Synpro, such that the defense and/or indemnification provisions of the APA were triggered.

The essential question in this contractual dispute is whether the claims in any of the Antitrust Cases arose out of pre-APA conduct of Synpro. If the answer is yes, then the defense and indemnity provision of the APA was triggered. If the answer is no, then it was not. Because the Court answers this question in the negative, Cookson's motion for summary judgment is granted, and Ferro's motion is denied.

The complaints in the Antitrust Cases first were filed beginning in 2003. Ferro was named as a defendant in each of the four Antitrust Cases. When filed, those complaints made no mention of Synpro or Cookson, nor were any of the allegations contained therein directed at Synpro or Cookson. The complaints later were amended, some several times, as recently as March 1, 2006. (Second Amended Indirect–Purchaser Class Action Complaint, Pl.'s Ex. F.) None of the complaints, even as amended, mentioned Synpro or Cookson. Nor did the complaints include factual allegations involving conduct of Synpro or its employees.[10]

Ferro nevertheless asserts in this case that the claims in the Antitrust Cases were based, at least in part, upon conduct of Synpro. Ferro's assertion is founded upon certain discovery that took place in the Antitrust Cases. While Ferro argues that this discovery revealed to it that the claims against Ferro related to Synpro's conduct, the Court rejects this argument. Viewing the evidence most favorably to Ferro, the Court finds that no reasonable

---

**10.** Ferro states in its memorandum in support of its Motion for Partial Summary Judgment that there is no factual dispute that the complaints in the Antitrust Cases state claims that are within, or arguably within, the purview of the obligation to defend [ ... ]. (Pl.'s Mot. for Partial Summ. J. at 2.) This statement is completely unsupported by fact. Tellingly, nowhere in its brief does Ferro cite any portion of the any of the complaints in the Antitrust Cases. Instead, Ferro relies exclusively on snippets of the discovery record in those cases. As explained herein, the Court independently examined the complaints in the Antitrust Cases and finds that they did not, in fact, state claims covered, or arguably covered, by the defense provision of the APA. To the extent that Ferro relies on vague references in the complaints to "unnamed coconspirators" as including potential claims against Synpro and therefore rendering coverage arguable, that assertion is devoid of merit. Ferro admits that it did not learn that Synpro-related claims were involved until certain discovery took place in 2005. Of course, Ferro knew at the time the Antitrust Cases were filed that it had acquired Synpro, and that Synpro was engaged in that industry. Thus, Ferro cannot contend that it believed the references to "unnamed coconspirators" related to Synpro because there is no evidence that it had such a belief. Moreover, the Antitrust Plaintiffs eventually received the benefits of discovery, and never "named" Synpro as one of the allegedly unnamed coconspirators.

juror could conclude that the claims in the Antitrust Cases arose out of Synpro's retained liabilities. This finding mandates summary judgment in favor of Cookson.

Under the plain meaning of the APA, the defense and indemnification provision was triggered only by the assertion of claims against Ferro based upon Synpro's retained liabilities, which included any antitrust violations Synpro may have committed prior to the APA. Even the most critical parsing of the discovery record reveals that the Antitrust Plaintiffs never asserted any claims against Ferro that arose out of Synpro's conduct. This conclusion is rather easy to reach. It stands to reason that if the Antitrust Plaintiffs sought to assert a claim relating to Synpro, they would have either named Synpro as a defendant, asserted successor liability against Ferro based upon its acquisition of the Synpro assets, or, at the very least, included factual allegations in the complaint implicating Synpro or its employees in the alleged wrongdoing. The Antitrust Plaintiffs did none of these things.

As discussed *infra,* it is undisputed that the Antitrust Plaintiffs were aware of Ferro's acquisition of Synpro. But despite this knowledge, the Antitrust Plaintiffs, although filing numerous amended complaints, never named Synpro or Cookson as defendants, and never included factual allegations implicating conduct by Synpro or its employees. Remarkably, Ferro has not cited a single allegation from any of the complaints in support of its contention that the Antitrust Plaintiffs alleged claims arguably based upon Synpro's retained liabilities.

Nonetheless, Ferro takes the position that the Antitrust Plaintiffs, instead of suing Synpro or Cookson, treated Ferro as including pre-APA Synpro, and sought to hold Ferro liable for antitrust violations committed by Synpro. But Ferro's position is belied by the record, and by common sense. As an initial matter, Ferro's position makes no sense because if the Antitrust Plaintiffs had asserted claims against Ferro based upon Synpro's actions (which they did not), Ferro had a perfectly valid defense to such claims—it did not assume Synpro's retained liabilities, either under the express terms of the APA or under Ohio law. *See Flaugher v. Cone Automatic Mach. Co.,* 30 Ohio St.3d 60, 62, 507 N.E.2d 331 (1987).[11] Thus, had such claims been asserted, all Ferro needed to do was show the APA to the Antitrust Plaintiffs. The Antitrust Plaintiffs, in turn, could have sued Cookson; but they did not, despite their awareness of Synpro and Cookson.[12]

Ferro contends that, the aforementioned facts notwithstanding, the Antitrust Plaintiffs indeed asserted claims against Ferro based upon Synpro's conduct. Ferro's evidentiary support for this contention derives solely from the discovery record in the Antitrust Cases. Specifically, Ferro

---

**11.** In a sale of corporate assets, the buyer corporation is not liable for the seller's tortious conduct unless one of four exceptions applies: (1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a de facto consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability. *Flaugher,* 30 Ohio St.3d at 62, 507 N.E.2d 331. None of the exceptions applies in this case. In fact, pursuant to the terms of the APA, Ferro expressly declined to assume liability for pre-APA conduct by Synpro.

**12.** And as a common sense proposition, it is undeniable that if the Antitrust Plaintiffs believed they had uncovered another defendant against which they possessed evidence of viable claims, they would have added that defendant to the Antitrust Cases. That they did not illustrates rather clearly that no claims were asserted in the Antitrust Cases that arose out of Synpro's retained liabilities.

points to an answer to interrogatories issued by some of the Antitrust Plaintiffs, and requests for admissions issued by the Antitrust Plaintiffs to Ferro and Chemtura Corporation.[13] These discovery documents show that the Antitrust Plaintiffs were aware of Ferro's acquisition of Synpro assets and of certain price increases enacted by Synpro during the 1990s, among myriad other price increases by other participants in the plastics additives industry (many of which were named as defendants), and that the Antitrust Plaintiffs asked about whether a meeting took place between Nirmal Jain and Synpro's President, Tom Jennings.

■ The price increases referenced by the Antitrust Plaintiffs in their answer to interrogatories, standing alone, fall far short of evidencing illegal activity involving Synpro (either illegal activity in fact, or the mere allegation of illegal activity by the Antitrust Plaintiffs). The same can be said of the potential meeting between Jain and Jennings. Both were executives in the same industry, and the fact that they met would not establish anything untoward. Moreover, the Antitrust Plaintiffs never alleged that in fact such a meeting occurred, but merely asked whether it did. Notably, the Antitrust Plaintiffs never asked Ferro or anyone else to admit that

Jennings or Synpro in fact entered into a conspiracy to fix prices. Thus, even if the Antitrust Plaintiffs had proved every fact relating to Synpro that can be gleaned from the discovery record in the Antitrust Cases, they still would not have had a viable claim against Synpro, because nowhere does the discovery record suggest even an allegation that Synpro entered into a conspiracy to fix prices or otherwise violate the antitrust laws.[14]

Returning to the contract language at issue, and having parsed Ferro's evidentiary submissions, it is impossible to conclude that the Antitrust Plaintiffs at any point asserted a claim which arose out of Synpro's retained liabilities. A claim or cause of action within the meaning of the APA must be evidenced by more than a few questions or statements set forth in written discovery. Such questions and statements are not "claims" or "causes of action." They are not even allegations. Yet this is all Ferro has presented. Accordingly, the Court concludes that Ferro's claims for both defense and indemnification fail as a matter of law.

In its motion for summary judgment, Ferro urges the Court to construe the APA under Ohio law applicable to claims against insurance companies for defense and indemnity pursuant to policies of insurance issued by the insurer.[15] However,

---

**13.** As discussed in further detail *infra*, Ferro's other sources are not probative of the issues in this case.

**14.** Section 1 of the Sherman Act provides, in part, that "[e]very contract, combination [ ... ] or conspiracy, in restraint of trade or commerce among the several States, [ ... ] is declared to be illegal." 15 U.S.C. § 1. To prove a violation, the plaintiff must establish, *inter alia*, that the defendants contracted, combined or conspired among each other, and that the objects of and conduct pursuant to that contract or conspiracy were illegal. *Expert Masonry, Inc. v. Boone County, Ky.*, 440 F.3d 336, 342 (6th Cir.2006) (citations omitted).

**15.** The Court questions the applicability of such authority to the case at bar because Cookson is not an insurance company, and the APA, while it includes certain insurance-related features, is not an insurance policy. *See Dobbelaere v. Cosco, Inc.*, No. 11–99–18, 2000 WL 425754 (Ohio App.3d Dist. Apr. 20, 2000) (applying contract (not insurance) law to dispute over duty to defend and indemnify between parties to an asset purchase agreement that were not insurance companies). The APA was an arm's length transaction negotiated between two sophisticated business entities. Thus, many (if not all) of the policy justifications underlying insurance law are absent from the instant case. These justifications include the adhesive nature of insurance contracts in which the insured has little,

even if Ohio insurance law is applied to Ferro's claims, the Court concludes that Ferro's claims nevertheless fail.

### a. Duty to Defend

Under Ohio law, an insurer's duty to defend is broader and distinct from its duty to indemnify. *Ohio Gov't Risk Mgmt. Plan v. Harrison*, 115 Ohio St.3d 241, 245, 874 N.E.2d 1155 (2007) (citations omitted). The insurer's obligation to defend "is initially determined by the scope of the pleadings." *M/G Transport Servs., Inc. v. Water Quality Ins. Syndicate*, 234 F.3d 974, 977 (6th Cir.2000) (citing *City of Willoughby Hills v. Cincinnati Ins. Co.*, 9 Ohio St.3d 177, 179, 459 N.E.2d 555 (1984)). "The duty to defend arises when the complaint contains an allegation in any one of its claims that could arguably be covered by the insurance policy." *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 115 Ohio St.3d 306, 307, 875 N.E.2d 31 (2007) (citing *Sharonville v. Am. Employers Ins. Co.*, 109 Ohio St.3d 186, 189, 846 N.E.2d 833 (2006)). The duty to defend is not determined by the ultimate outcome of the action or the ultimate liability of the insurer. *Motorists Mut. Ins. Co. v. Trainor*, 33 Ohio St.2d 41, 294 N.E.2d 874 (1973). Further, "the duty to defend need not arise solely from the allegations in the complaint but may arise at a point subsequent to the filing of the complaint." *Cincinnati Ins. Co. v. Anders*, 99 Ohio St.3d 156, 159, 789 N.E.2d 1094 (2003) (quoting *Willoughby Hills*, 9 Ohio St.3d at 179, 459 N.E.2d 555). The burden is on the insured to "demonstrate [ ... ] that the allegations in the complaint arguably bring the claims within the policy's coverage." *XXL of Ohio, Inc. v. City of Broadview*

*Heights*, 341 F.Supp.2d 825, 841 (N.D.Ohio 2004)

An insurer is not, however, required to "defend any claim that is clearly and indisputably outside the contracted policy coverage." *CPS Holdings*, 115 Ohio St.3d at 307, 875 N.E.2d 31 (citing *Preferred Risk Ins. Co. v. Gill*, 30 Ohio St.3d 108, 113, 507 N.E.2d 1118 (1987)). There is no duty to defend "if there is no set of facts alleged in the underlying complaint against the insured that, if proven true, would invoke coverage." *Cincinnati Indem. Co. v. Martin*, 85 Ohio St.3d 604, 605, 710 N.E.2d 677 (1999). "Importantly, courts will not imply that a cause of action has been pled in a complaint merely because the allegations in the complaint indicate that another cause of action *might* have happened." *Erie Ins. Exch. v. Lansberry*, No. 07 CO 6, 2008 WL 852453, at *8 (Ohio App. 7th Dist., Mar. 10, 2008) (citing *Motorists Mut. Ins. Co v. Nat'l Dairy Herd Improvement Ass'n, Inc.*, 141 Ohio App.3d 269, 279 (10th Dist.2001)).

By its own admission, Ferro concedes that it fails the initial test because the complaints in the Antitrust Cases did not allege arguably covered claims at the time those actions were filed. (Pl.'s Reply in Support of Mot. for Summ. J. at 5) ("Ferro did not find out that it was sued in the Antitrust Cases in part because of Synpro's pre-acquisition conduct until discovery in the Antitrust Cases."); (*see also* Pl.'s Mot. for Summ. J. at 13) ("Here, during the course of discovery in the Antitrust Cases, Ferro learned that its participation in the cases was partially attributable to the conduct of Synpro.") Neither Cookson nor Synpro was named as a defendant in any of the Antitrust Cases, nor did their names appear in the complaints

if any, bargaining power, the public policy objective of compensating tort victims, and the inequity of permitting an insurer to receive a windfall due to a technicality. *See*

*Ferrando v. Auto–Owners Mut. Ins. Co.*, 98 Ohio St.3d 186, 195, 781 N.E.2d 927 (2002) (discussing issues regarding the timeliness of notice to an insurer).

in those cases. Ferro clearly did not believe that the complaints in the Antitrust Cases stated claims that arguably were covered by the defense and indemnification provision of the APA at the time, because Ferro was sued in the Antitrust Cases in 2003, but did not demand coverage from Cookson until 2006. Even under the liberal standards of notice pleading, the complaints did not put Ferro on notice that the Antitrust Plaintiffs were asserting claims based upon Synpro's conduct. This is dispositive of Ferro's claims.

While Ferro is correct in pointing out that, in certain circumstances, the duty to defend can arise at some point after the filing of the underlying complaint, *see Willoughby Hills*, 9 Ohio St.3d at 179, 459 N.E.2d 555, the facts of this case do not support post-complaint activation of the duty to defend. In *Willoughby Hills*, the Ohio Supreme Court addressed the effect of Ohio's adoption of notice pleading upon the rule, announced in *Motorists Mut. Ins. Co. v. Trainor*, 33 Ohio St.2d 41, 294 N.E.2d 874 (1973), that an insurer's duty to defend arose solely from the pleadings. The court in *Willoughby Hills* concluded that, under notice pleading standards, the duty to defend could arise at some point after the complaint was filed. 9 Ohio St.3d at 179, 459 N.E.2d 555. Accordingly, the Ohio Supreme Court reformulated the rule, amending it to provide that when the pleadings "state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim." *Id.* at 180, 459 N.E.2d 555.

■ The rationale of *Willoughby Hills* is clear; that is, under notice pleading, the scope of the allegations may expand through discovery such that, while not apparent initially, the claims may become covered by the insurance. *Willoughby*

*Hills* does not, however, speak directly to the situation before the Court. Despite the court's statement that the duty to defend may arise after the filing of the underlying complaint, the court's pronouncement in *Willoughby Hills*, when viewed in light of the facts of the case, contemplates coverage analysis based upon the allegations of the underlying complaint. *See Weaver v. Motorists Mut. Ins. Co.*, 62 Ohio App.3d 836, 839, 577 N.E.2d 703 (2d Dist. 1989). Notably, the Ohio Supreme Court's statement in *Willoughby Hills* is couched completely in terms of the pleadings, providing that coverage may arise where the pleadings set forth an arguably covered claim, or there is doubt as to whether a theory of recovery was pleaded. 9 Ohio St.3d at 180, 459 N.E.2d 555. *Willoughby Hills*, therefore, does not stand for the proposition (for which Ferro cites it) that coverage may arise after the filing of the complaint where the pleadings did not create even an arguable basis for coverage. Subsequent cases applying *Willoughby Hills* have made this clear. As has been explained by Ohio courts of appeals,

> The inquiry into the insurer['s] duty to defend must naturally begin with a close scrutinization of the allegations of the disputed complaint. If such a review reveals claims which 'potentially' or 'arguably' fall within the purview of the policy, then, and only then, does *Willoughby Hills* dictate that a court look to extraneous matters to determine whether a defense is required of the insurer. [* * *]. Even under the liberal notions of notice pleading it would be inherently unfair to require the insurer to provide a defense where the pleadings failed to notify, even arguably, that the insured is being sued on a claim covered by the policy.

*Nat'l Dairy Herd*, 141 Ohio App.3d at 279, 750 N.E.2d 1169 (quoting *Leland Electrosystems, Inc. v. Travelers Ins. Co.*, No. 8580, 1984 WL 5371 (Ohio App.2d Dist.,

July 10, 1984)); *accord Hahn's Elec. Co. v. Cochran*, No. 01AP–1391, 2002 WL 31111850, at *4 (Ohio App. 10th Dist. Sept. 24, 2002). Courts "will not, [ . . . ] impose a duty to defend based on allegations outside the complaint, where the complaint does not state a claim that arguably triggers coverage." *Id.* at 278, 750 N.E.2d 1169. The Sixth Circuit cited this analysis with approval, following *Nat'l Dairy Herd* in affirming a district court's grant of summary judgment in favor of an insurer on a claim for defense and indemnification. *See Holloway Sportswear, Inc. v. Transportation Ins. Co.*, 58 Fed.Appx. 172, 175 (6th Cir.2003).

 The Court agrees with the analysis set forth in *Nat'l Dairy Herd*, and finds that, based upon Ferro's concession that the complaints in the Antitrust Cases did not allege claims arguably covered by the APA, Ferro's claim for defense fails. Accordingly, the Court need not delve into the discovery record in the Antitrust Cases to determine whether Cookson was required to defend those actions.[16] However, even if such inquiry is conducted, the outcome is unchanged.

Ferro asserts that circumstances subsequently arose during discovery in the Antitrust Cases which implicated pre-acquisition conduct by Synpro, thereby triggering Cookson's duty to defend. The circumstances that Ferro contends implicated Synpro and triggered the duty to defend are as follows: (1) in interrogatories served upon the Antitrust Plaintiffs in one of the Antitrust Cases by one of Ferro's co-defendants, the Antitrust Plaintiffs were asked for information relating to price-fixing allegations, and responded by referring to Ferro's acquisition of Synpro in 1995; (2) two former employees of Crompton Corporation (one of Ferro's co-defendants in the Antitrust Cases), Dr. Lawrence Brecker and Nirmal Jain, were deposed in connection with the Antitrust Cases, and were asked questions regarding conduct of Synpro; (3) in requests for admissions served upon Ferro in one of the Antitrust Cases, Ferro was asked to admit that in 1993 "Nirmal Jain met with Tom Jennings of Synthetic Products Co. ("Synpro"), which was acquired by Ferro around the end of 1995"; (4) counsel for Ferro, Mr. Rains, approached Mr. Jennings and asked him about his work at Synpro and the alleged anticompetitive conduct, and Jennings declined to discuss the matter with Rains; (5) Robert Kaplan, counsel for the plaintiffs in one of the Antitrust Cases, stated that he was aware of Ferro's acquisition of Synpro, defined Ferro to include Synpro when drafting discovery requests, and took the position that the record in the Direct Purchaser Litigation included evidence against both Ferro and Synpro; and (6) in another of the Antitrust Cases, Ferro was served with requests for admissions that defined Ferro to include both Ferro and Synpro, and was asked to admit or deny conduct of Synpro and its employees that occurred between 1990 and 1995.[17] According to

16. To the extent that any of the cases cited by Ferro suggest otherwise, the Court's view is that any such interpretation reads *Willoughby Hills* too broadly. Like the court in *Nat'l Dairy Herd*, the Court reads *Willoughby Hills* to permit reference to evidence outside the pleadings to determine the duty to defend only where the pleadings themselves admit of at least an arguably covered claim. *Willoughby Hills* requires, at a minimum, that a party seeking a defense from an insurer demonstrate the existence of a potentially or arguably covered claim on the basis of the pleadings. Reference to extrinsic evidence is appropriate only to clarify whether a potentially or arguably covered claim is, in fact, covered.

17. Ferro also asserts that, somehow, its duty to defend claim is supported by the fact that the releases it obtained from the Antitrust Plaintiffs in the settled cases released claims against Synpro. This is nonsensical. The

Rains, based upon these "facts," Ferro concluded that it was named as a defendant in the Antitrust Cases based at least in part upon pre-acquisition conduct by Synpro. (Rains Aff. ¶ 3.)

Ferro concedes that until discovery was conducted in the Antitrust Cases, it was unaware that the claims in those cases were based upon Synpro's pre-acquisition conduct. It claims that the circumstances enumerated above illuminated the allegations of the underlying Antitrust Cases in a way that made it apparent that the claims asserted by the Antitrust Plaintiffs in those cases were arguably covered by the defense and indemnity clause of the APA. For the reasons stated *supra*, the Court finds that the law does not support such an argument. However, even if Ferro's argument is appropriate for consideration, when viewing the evidence most favorably to Ferro, the Court cannot credit this argument. The circumstances Ferro points to as somehow creating coverage where before there was none did not in any way affect whether the coverage question was arguable. Because Ferro concedes (as it must) that coverage was not arguable when the complaints originally were filed, and the Court finds that the circumstances cited by Ferro did nothing to alter the scope of the allegations or claims asserted by the Antitrust Plaintiffs, the Court grants summary judgment in favor of Cookson on Ferro's claim for defense.

Upon close inspection, the record discloses not a single actual fact, or even a specific factual allegation, levied by the Antitrust Plaintiffs that would have exposed Ferro to antitrust liability based upon the retained liabilities of Synpro. The only type of claim "arguably covered" by the defense and indemnity provision in

the APA would be one "arising out of" Synpro's retained liabilities, i.e., one based upon allegations of conduct by Synpro prior to the execution of the APA. Ferro admits that the complaints in the Antitrust Cases facially alleged no such claims. The circumstances identified by Ferro, contrary to Ferro's assertions, did not change the scope of the underlying antitrust allegations. The "evidence" put forth by Ferro in support of its claim, even when viewed most favorably to Ferro, fails to establish that the Antitrust Plaintiffs ever sought to assert claims against Synpro (or against Ferro based upon Synpro's conduct) "arising out of" Synpro's retained liabilities. Accordingly, Ferro's claims for defense and indemnity fail. A detailed examination of Ferro's "evidence" follows.

### i. Ferro's "Evidence"

### Direct Purchaser Plaintiffs' Responses to Interrogatories

In one of the Antitrust Cases (specifically, the "Direct Purchaser Litigation"), the Antitrust Plaintiffs served the defendants, including Ferro, with their "Supplemental Responses to the First Set of Interrogatories and Requests for Documents by Rohm & Haas Company Pursuant to the Court's March 28, 2005 Order." (Niehaus Aff., Ex. 4.) Therein, in response to an interrogatory requesting all information possessed by the plaintiffs relating to the allegations in the complaint "that the defendants, or any of them, conspired to fix, raise, maintain or stabilize the prices for heat stabilizers and/or impact modifiers and/or processing aids sold in the United States," the plaintiffs responded by referring to Synpro five times in a response that spans twenty-seven pages. First, in describing the defendants, all of which

content of a release of claims is not, in any recognizable way, evidence that, in fact, such

claims were asserted.

were producers of plastics additives, the description of defendant Ferro Corporation included the statement that "Ferro Corporation ("Ferro") acquired plastics additives producer Synthetic Products Company (Synpro) in October 1995." (Niehaus Aff., Ex. 4 at 7, ¶ 6.) Synpro was not mentioned separately, either as a defendant or as a non-defendant plastics additives producer.[18] Then, in the section of their response setting forth the information supporting the allegations of the consolidated amended complaint, the Direct Purchaser Plaintiffs stated that during the early 1990s, representatives of certain defendants met and agreed to support each other's price increases. (Id. at 14.) This group did not include either Ferro or Synpro.[19] The Direct Purchaser Plaintiffs went on to describe certain price increases that occurred in the plastics additives industry during the alleged conspiracy period. Over the course of the response, the Direct Purchaser Plaintiffs identify more than fifty price increases involving various products. Of these, four mention Synpro.[20] In the autumn of 1990, an increase in the price of heat stabilizers by $.07/lb. was announced by Akzo, Crompton, Synpro, Ferro and Baerlocher. (Id.) Following meetings held in 1992, Morton, Synpro, Akzo, Ferro, Baerlocher, and Atofina announced a 7% heat stabilizer price increase. (Id. at 15.) In the fall of 1994, a 7.5% increase in the price of mixed-metal heat stabilizers was announced by Synpro, Baerlocher, Akzo, Ferro, and OMG. (Id. at 16.) Finally, sometime between June and September 1995, following an alleged

meeting by Dow and Akzo executives, Akzo, Synpro, OMG and Baerlocher announced a 4% increase in the price of mixed-metal heat stabilizers. (Id. at 17.) By contrast, the Direct Purchaser Plaintiffs identified at least fifteen price hikes by Ferro. The response also identifies numerous meetings purportedly attended by industry executives. No Synpro employee is described as having attended any such meeting. In comparison, Ferro employees were listed as attending at least three such meetings. (Id. at 15, 17–18, 20.)

### Jain and Brecker Depositions

In the Direct Purchaser Litigation, the plaintiffs took the depositions of Nirmal Jain and Dr. Lawrence Brecker, both former employees of Crompton Corporation. During Jain's deposition, the Antitrust Plaintiffs asked Jain about whether or not he met with Tom Jennings. Specifically, the conversation between the plaintiff's attorney and Jain went as follows:

Q: At any time from 1990 through the time you were vice-president of Witco's Polymer Additives Division, did you have any meetings or conversations with a Tom Jennings?

A: I invoke my Fifth Amendment privilege.

Q: Was Mr. Jennings employed at Synpro, and then when Synpro was acquired by Ferro, employed by Ferro?

A: I invoke my Fifth Amendment privilege.

Q. At any time from 1990 through the time you were vice-president of Witco's

---

**18.** The plaintiffs' response does list several "Non–Defendant Plastics Additives Producers," including Cardinal Companies, L.P., OM Group, Inc., and Reagens Canada, Ltd. (Niehaus Aff., Ex. 4, at 9, ¶¶ 1–3.)

**19.** The individuals and companies allegedly involved were Nirmal Jain, Seymour Cohen, and Larry Brecker of Crompton, David Fultz

of Atofina, and Kees Van Neirop, Richard Miller, and Don Hampson of Akzo.

**20.** Three of the four also implicate Ferro in the same increase. The fourth, while not matched by Ferro on the same day, was preceded by a Ferro price increase less than two months prior. (Niehaus Aff., Ex. 4, at 17.)

Polymer Additives Division, did you have any meetings at your offices with Mr. Jennings about the pricing of heat stabilizers in the United States?

A: I invoke my Fifth Amendment privilege.

Q: Did you also have discussions with him about prices of ESBO in the United States?

A: I invoke my Fifth Amendment privilege.

Q: At any time from 1990 through the time you were vice-president of Witco's Polymer Additives Division, did you receive in advance from Mr. Jennings information about heat stabilizer price increases that Ferro was going to announce?

A: I invoke my Fifth Amendment privilege.

Q: At any time from 1990 through the time you were vice-president of Witco's Polymer Additives Division, did you also have telephone conversations with Tom Jennings while he was employed at Ferro about the pricing of heat stabilizers?

A: I invoke my Fifth Amendment privilege.

Q: Did you agree with Mr. Jennings that you would support each other's price increases for heat stabilizers?

A: I invoke my Fifth Amendment privilege.

(Niehaus Aff., Ex. 5.) Apparently, this charade with Mr. Jain went on throughout his deposition, whereby the counsel for the Antitrust Plaintiffs asked him the same or similar series of questions about various executives in the industry, and Jain responded by asserting his Fifth Amendment privilege.[21] This "evidence," if it rightly can be characterized as such, is wholly irrelevant to the instant case. Jain was not a Cookson or Synpro employee, and his responses (or any inference to be drawn from his refusal to answer) cannot be attributed to either entity.[22] Moreover, the questions by the plaintiff's attorney, and Jain's non-responses, do not define the time period in question, and therefore, even if Jain had responded by confirming a meeting with Jennings, Ferro would not have had any basis for concluding that pre-APA conduct was implicated. Most importantly for purposes of this action, Jain's assertion of his Fifth Amendment rights did not prompt the Antitrust Plaintiffs to assert claims against Synpro, and therefore Jain's deposition does nothing to aid Ferro's contention that discovery in the Antitrust Cases made it apparent that Ferro was entitled to a defense from Cookson.

The deposition testimony of Dr. Brecker, while perhaps more revelatory than Mr. Jain's (Brecker actually answered some questions), is similarly unhelpful to

---

21. For instance, in the four pages of deposition transcript attached to Ferro's motion, Jain was asked whether he met with Christopher Canarius of Ferro, Peter Anderson of Morton, and Robert Jones of Morton, and gave the same response as he did when asked about a meeting with Jennings: he asserted his Fifth Amendment rights. In fact, not only did Jain refuse to answer questions about meetings with other executives, he refused to answer any questions at all, even ones that had no potential to elicit an incriminating response. For example, when asked whether Morton was acquired by Rohm & Haas, Jain asserted his Fifth Amendment privilege.

22. In civil cases, the Supreme Court has held it permissible to draw a negative inference against a defendant based upon that defendant's invocation of his Fifth Amendment privilege. *See In re Moses*, 792 F.Supp. 529, 536 (E.D.Mich.1992) (citations omitted). Ferro, however, asks the Court to draw negative inferences against Cookson/Synpro based on the invocation of the Fifth Amendment privilege by Jain, an employee of Crompton. Ferro cites no authority that would allow such an inference, nor is the Court aware of any.

Ferro's claims in this case. Brecker was asked whether Jain ever told him about any conversations Jain had with Jennings concerning pricing. Brecker responded as follows:

> There was one particular instance I remember where apparently Nirmal Jain had a telephone conversation with Tom Jennings after which he [Jain] came into my office with a piece of paper that had written on it a whole bunch of stearate names with prices on it and said, according to Tom, these are the current market prices for these stearates.

(Niehaus Aff., Ex. 6.) Brecker then was asked if he remembered approximately when this conversation occurred, and responded, "No. It was sometime after I was the VP of the vinyl additives business unit. More than that I can't be specific." (*Id.*) This is the entirety of what Ferro claims is the relevant portion of Brecker's deposition. Like Jain's deposition, the Court finds Brecker's testimony to be wholly irrelevant and unsupportive of its claim. Like Jain, Brecker was not a Synpro or Cookson employee. Like Jain's testimony, Brecker's lacks any indication of when it occurred. Moreover, Brecker's testimony concerned prices for stearates, which, according to Jennings' unrefuted declaration, were not referred to in the industry as plastic additives, and therefore were not the subject of the antitrust actions. (Jennings Decl., ¶ 9.) In addition, even if Brecker's testimony was completely true (and it would be inadmissible hearsay if offered for its truth), the fact that Jennings provided Jain with a list of market prices for stearates at some unspecified time is, by itself, in no way suggestive of wrongdoing by Synpro. And again, like the Jain deposition testimony, it is clear that the Antitrust Plaintiffs did not assert claims against Synpro based upon Brecker's testimony, making it valueless when offered in support of Ferro's claims in this action.

### Chemtura Requests for Admissions

Next, in another of the Antitrust Cases (the "PolyOne Litigation"), the plaintiffs served the defendants with its "First Set of Requests for Admissions to Defendant Chemtura (f/k/a Crompton) Corporation." This set of requests was issued on June 7, 2006. One of the requests asked Chemtura f/k/a Crompton to "Admit that in 1993 Nirmal Jain met with Tom Jennings of Synthetics Products Co. ("Synpro"), which was acquired by Ferro around the end of 1995." (Niehaus Aff., Ex. 1.) That is the entirety of the allegedly relevant portion of the discovery request.

### Ferro Requests for Admissions

On March 30, 2007, well after this action was initiated, the Direct Purchaser and PolyOne Plaintiffs issued to Ferro their "Joint First Set of Requests for Admission to Ferro Corporation." (Niehaus Aff., Ex. 2.) Therein, the plaintiffs defined Ferro to include Synpro. (*Id.* at 3, ¶ 10.) The plaintiffs requested the following admissions:

1. Seymour Cohen of Crompton and Chris Canarius of Synpro discussed the pricing of mixed-metal heat stabilizers.

2. Seymour Cohen of Crompton and Gary Curtis of Synpro discussed the pricing of mixed-metal heat stabilizers.

3. Tom Jennings of Synpro and Nirmal Jain of Crompton discussed the pricing of mixed-metal heat stabilizers.

[ ... ]

6. On or about October 1, 1990, Synthetic Products announced a price increase of $.07/lb on mixed-metal solid and liquid stabilizers effective immediately.

[ ... ]

13. On or about August 10, 1992, Synthetic Products announced a price increase of 7% on mixed-metal liquid and

powder stabilizers effective August 15, 1992.

[ ... ]

22. On or about September 28, 1994, Synthetic Products announced a price increase of 7.5% on all liquid and powder mixed-metal stabilizers effective October 16, 1994.

[ ... ]

29. On or about June 26, 1995, Synthetic Products announced a price increase on its mixed-metal heat stabilizers effective July 1, 1995.

(*Id.* at 5–8.) This set of requests substantially tracks the statements regarding Synpro price increases set forth in the plaintiffs' responses to interrogatories and reiterates the question asked of Chemtura (f/k/a Crompton) regarding a meeting between Jain and Jennings. The only additions appear in requests (1) and (2), regarding the existence of meetings between a Crompton employee and two different Synpro employees.

**Jennings' Refusal to Discuss Antitrust Cases with Rains**

Ferro's outside counsel in this case and in the Antitrust Cases, M. Neal Rains, contacted Thomas Jennings and asked him to discuss allegations that Synpro engaged in anticompetitive conduct during Jennings' tenure. Jennings refused.

Cookson submitted the declaration of Mr. Jennings in support of its motion. In his declaration, Jennings stated that he never entered into any agreement with a competitor to fix prices, never provided a competitor with information regarding Synpro's pricing of plastic additives, and

never provided advance notice of pricing announcements to any of Synpro's competitors. (Jennings Decl., ¶¶ 4–5.) Jennings accepted a position with Ferro at the time the APA was executed, and worked at Ferro from January 1996 until his resignation in June 1996. (*Id.*, ¶ 7.)

Ferro scheduled Jennings' deposition in connection with this action, but canceled it.

**The Kaplan Affidavit**

 In support of its claims in this action, Ferro submitted the affidavit of attorney Robert N. Kaplan. Kaplan is a partner at the law firm of Kaplan Fox & Kilsheimer LLP, and was co-lead counsel in the Direct Purchaser Litigation.[23] (Kaplan Aff., ¶ 1.) In his affidavit, Kaplan stated that discovery in the Direct Purchaser Litigation revealed that Ferro purchased Synpro in 1995, and therefore (according to Kaplan), "Ferro would have been potentially liable for any anti-competitive conduct engaged in by Synpro prior to the time Ferro acquired Synpro's Plastics Additives business."[24] (*Id.*, ¶ 3.) "Ultimately, the investigation resulted in bringing the Litigation against Ferro, and certain other Plastics Additives manufacturers, alleging violations of section 1 of the Sherman Act." (*Id.*) Kaplan stated that he participated in drafting written discovery to Ferro and the other defendants in the Direct Purchaser Litigation, and due to Ferro's purchase of Synpro's plastics additives business, the plaintiffs' written discovery "sought information regarding Ferro, Synpro, as well as the other defendants." (*Id.*, ¶ 4.) According to Kaplan, "[a]t the conclusion of merits discovery, it

---

**23.** Kaplan was not involved in any of the other three cases, and therefore his statements have no bearing on issues relating to those cases. (Kaplan Aff. at 1, n. 1.)

**24.** Notably, this is an erroneous legal position. Under Ohio law, the purchaser of assets

is only liable for pre-acquisition torts of the acquired company if it expressly assumes such liability. *See Flaugher v. Cone Automatic Mach. Co.*, 30 Ohio St.3d 60, 62, 507 N.E.2d 331 (1987). Pursuant to the APA, Cookson expressly retained, and Ferro expressly did not assume, such liability.

was [the Direct Purchaser] Plaintiffs' position that there was evidence in the discovery record, concerning the participation of Ferro and Synpro in the alleged Plastics Additives conspiracy." (*Id.*, ¶ 12.)

### ii. Effect of Ferro's "Evidence" Regarding Synpro

Collectively, the circumstances identified by Ferro comprise (a) questions posed by the Antitrust Plaintiffs (specifically, the Direct Purchaser Plaintiffs and the Poly-One Plaintiffs) in discovery—not factual allegations of proscribed antitrust conspiracy involving Synpro; (b) deposition testimony by non-Synpro employees that in no way implicated Synpro (and from which Ferro attempts in this case to draw unjustifiable inferences); (c) an apparent rebuff by Synpro's former President Jennings of entreaties by Ferro's counsel to discuss his employment at Synpro; and (d) innocuous and/or irrelevant statements by counsel for the Plaintiffs in one of the four underlying Antitrust Cases regarding the record in the Direct Purchaser Litigation. Viewed either in isolation or cumulatively, the identified circumstances do not establish a change in the allegations in any of the Antitrust Cases that possibly could have created an arguable basis for coverage where none existed before. In fact, the Court concludes that the identified circumstances do not establish any relevant change in the underlying antitrust allegations during the course of discovery.

It is instructive to note that the Antitrust Cases, which Ferro treats as a single unit for purposes of its claims in this case, actually constitute four separate actions. This distinction is important because of the manner in which claims for defense, like the ones asserted here by Ferro, are assessed under Ohio law. This analysis can be performed only on a case-by-case basis. First, the Court looks to the face of the complaint to determine whether it gives rise to a claim arguably covered by insurance (in this case, by the defense and indemnity provision of the APA). Here, Ferro concedes that none of the four complaints gave rise to an arguably covered claim against pre-APA Synpro.[25] Instead, Ferro claims that the circumstances detailed *supra* showed that the Antitrust Plaintiffs were asserting claims based on Synpro's conduct. Accordingly, the Court looks to whether the identified circumstances expanded the original allegations of each of the underlying complaints to arguably encompass claims based upon Synpro's retained liabilities. Ferro fails to analyze these circumstances individually, as they relate to each of the Antitrust Cases.

### iii. The California State Court Action

Engaging in an individualized, case-by-case review, the record is bereft of any evidence linking allegations relating to Synpro to the California state court action. Indeed, Ferro makes no effort to tie the circumstances it has identified to the California action, instead attempting to bootstrap its claim for a defense in that action to its claims relating to the federal court actions. There is no basis in the record for doing so. None of the "circumstances" identified by Ferro, which constitutes the entirety of Ferro's "evidence" in this action, bears any relationship to the California action. The identified discovery documents and deposition transcripts all relate to the antitrust actions in federal court. There is no evidence before the Court indicating that those documents were entered into the record in the California action. Thus, the entirety of the record in this case with respect to the California action is the complaint itself. As Ferro admits, the complaint does not name Syn-

---

**25.** As explained *supra,* this is dispositive of Ferro's claims.

pro or Cookson as a defendant and does not allege facts relating to Synpro. Accordingly, the Court concludes that Ferro's claim for a defense of the California action is unfounded, and fails as a matter of law. Thus, summary judgment in favor of Cookson on this portion of Ferro's claim is warranted.

### iv. The Federal Court Antitrust Actions

From an evidentiary standpoint, Ferro's claims for defense in the federal actions present closer questions than its claim in the California action. There is at least some evidence in the record that gives Ferro grounds for arguing that the Antitrust Plaintiffs, specifically those in the federal actions (the "Federal Antitrust Plaintiffs"), asserted claims based on conduct by Synpro. The three federal cases were consolidated for purposes of discovery,[26] giving Ferro a reasonable basis for asserting that its "evidence" relates to each of the three federal antitrust actions. For several reasons, the Court concludes, however, that even when viewed in the light most favorable to Ferro, this evidence does not establish a genuine issue of material fact sufficient to preclude summary judgment in favor of Cookson.

Ferro's best evidence, indeed its only evidence,[27] comes from the discovery record in the federal antitrust actions, specifically from the Federal Antitrust Plaintiffs'

responses to interrogatories, and the requests for admissions directed to Chemtura and Ferro. Those documents establish that the plaintiffs (a) knew that Ferro acquired the Synpro assets in 1995; (b) knew about increases in the price of plastic additives that occurred during the 1990s, including certain increases instituted by Synpro; (c) asked Chemtura to admit that Jennings met with Jain; and (d) long after this action was instituted by Ferro against Cookson, the Federal Antitrust Plaintiffs asked Ferro to admit that Jennings met with Jain, and that two other Synpro employees met with Crompton employees. What those documents fail to establish is that the Federal Antitrust Plaintiffs ever alleged that Synpro or its employees were involved in the antitrust conspiracy that formed the basis for their claims. "The nature of the claims in the complaint cannot be divorced from the factual allegations upon which those claims are based." *Twin Maples Veterinary Hosp. v. Cincinnati Ins. Co.,* 159 Ohio App.3d 590, 597, 824 N.E.2d 1027 (2d Dist.2005). "If the insurance company is to be required to provide a defense for its policy holder, the underlying claims must at least arguably fall within the coverage of the policy." *Cincinnati Ins. Co. v. Anders,* 99 Ohio St.3d 156, 160, 789 N.E.2d 1094 (2003). As Ferro readily concedes, the allegations of the underlying complaints did not allege a claim "arising out of" Synpro's retained

---

**26.** *See* Rains Aff. ¶ 7.

**27.** For the reasons stated previously, the Court finds the Jain and Brecker depositions are not probative of any relevant issue. Moreover, the Kaplan affidavit does not support Ferro's claim because Kaplan does no more than declare facts elsewhere evident from the record (that Ferro acquired Synpro assets and that discovery requests asked about both Ferro and Synpro) and provide his characterization of the record in the Direct Purchaser Litigation. Kaplan's assertion that the record in the Direct Purchaser Litigation in-

cluded evidence against both Synpro and Ferro is irrelevant. Ferro has had every opportunity to put forth any evidence that was in that record, and Kaplan's personal belief about the contents of that record does nothing to add to or subtract from any inference properly drawn from that record. Finally, the fact that Jennings refused to speak with Rains when asked does not aid Ferro's claim. Ferro had every opportunity to depose Jennings but declined to do so. Jennings has submitted a declaration in support of Cookson's motion, the contents of which are not contradicted by any evidence in the record.

liabilities. Subsequent discovery in the Antitrust Cases, as revealed by the evidence submitted by Ferro, does not establish that the plaintiffs in those cases ever asserted a claim, or allegations that could have formed the basis for a claim, premised upon the actions of Synpro. The Court simply cannot conclude that the identification of price increases announced by Synpro, coupled with requests by the plaintiffs to confirm or deny whether certain individuals met with each other, amounts to the assertion of a claim by the Federal Antitrust Plaintiffs arising out of Synpro's retained liabilities that potentially could trigger the defense and indemnity provision of the APA.[28] Accordingly, Ferro's claim for a defense in those cases based upon the APA fails.

Moreover, the combination of Ferro's own admissions and the undisputed facts in the record independently mandate summary judgment in favor of Cookson. If Ferro ever faced any potential liability in the Antitrust Cases based upon pre-APA Synpro conduct, such potential would have been evident from the face of the complaints and the facts then known to Ferro. Specifically, Ferro admits that it knew that the Antitrust Plaintiffs alleged the existence of a price-fixing conspiracy in the market for plastic additives occurring from 1990 to 2003 when the underlying antitrust complaints were filed in 2003. The Antitrust Plaintiffs, however, did not sue Cookson or Synpro, did not mention Cookson or Synpro in the complaints, and did not allege any facts relating to Cookson or Synpro. Ferro also cannot deny that it knew that it purchased the Synpro assets in 1995, and that Synpro, prior to the asset purchase, had engaged in the sale of plas-

tic additives. Thus, Ferro was on at least constructive notice that the scope of the allegations in the Antitrust Cases encompassed a price-fixing conspiracy in the market for plastic additives dating back to 1990, and, therefore, that such conspiracy potentially involved conduct of an independent Synpro prior to the acquisition by Ferro of the relevant Synpro assets. But Ferro did not seek coverage from Cookson under the APA at that time, and in fact concedes that the complaints in the Antitrust Cases did not then create an arguable basis for coverage. Since Ferro admits that no such potential was evident at the outset, and the Court concludes, based upon an intense examination of the evidence in this action, that the subsequent discovery did not change the scope of the underlying allegations or claims, the Court is led inexorably to the conclusion that the claims in the Antitrust Cases never arguably fell within the coverage provided by the APA. Accordingly, the duty to defend never arose.

■ Under the circumstances, Ferro's claim is further undermined by the nature of the liability it conceivably could have faced, had the Antitrust Plaintiffs alleged claims against it based upon Synpro's retained liabilities (which the Court finds was not the case). That is, the only potential liability faced by Ferro based upon Synpro's retained liabilities was as successor liability based upon its purchase of the assets. Under Ohio law, and under the explicit terms of the APA, Ferro was not liable as a corporate successor because it did not assume such liability in the purchase. *See Flaugher v. Cone Automatic Mach. Co.*, 30 Ohio St.3d 60, 62, 507 N.E.2d 331 (1987).[29] Therefore, had the

---

**28.** Without question, the Antitrust Plaintiffs, represented by highly sophisticated counsel, knew how to and had every incentive to assert claims against Cookson/Synpro had they thought such claims warranted by the evidence.

**29.** In a sale of corporate assets, the buyer corporation is not liable for the seller's tortious conduct unless one of four exceptions applies: (1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a de facto consolidation or

Antitrust Plaintiffs asserted such claims against Ferro, Ferro possessed a perfectly valid defense to such claims.[30] Coupling this with the undeniable facts that the Antitrust Plaintiffs (a) knew about the asset purchase, and thus had access to, and likely did discover, the APA; and (b) knew how to sue Cookson or Synpro (which would have been the proper parties) based upon the retained liabilities but elected not to do so, yields additional support for the denial of Ferro's claim for defense and indemnity. Under the circumstances, Ferro's position that the Antitrust Plaintiffs asserted claims arguably arising out of the retained liabilities is untenable, and is betrayed by the record evidence.

### b. Duty to Indemnify

■ Because the duty to defend is much broader than the duty to indemnify, and the Court concludes that Cookson owed Ferro no duty to defend any of the Antitrust Cases, Ferro's failure to establish a right to a defense is necessarily fatal to its indemnity claim. Accordingly, the Court must grant Cookson's motion for summary judgment on the indemnification issue.

■ Moreover, even if Ferro could establish that Cookson owed it a defense, Ferro's claim for indemnity nevertheless fails. In contrast to the broader duty to defend, which is based upon the allegations presented, the narrower duty to indemnify is tied to the insured's actual legal liability. *AMCO Ins. Co. v. Lauren–Spencer, Inc.,* 500 F.Supp.2d 721, 726 (S.D.Ohio 2007) (citation omitted). "The duty to indemnify arises from the conclusive facts and resulting judgment." *Pilkington N. Am., Inc. v. Travelers Cas. & Surety Co.,* 112 Ohio St.3d 482, 487, 861 N.E.2d 121 (2006) (citation omitted). None of the Antitrust Cases has been tried to a judgment; two have settled, and the other two remain pending. "Whether the occupier settles the claim voluntarily or pays it by force of judgment does not affect his right to indemnity." *Globe Indem. Co. v. Schmitt,* 142 Ohio St. 595, 53 N.E.2d 790 (1944). In an action for indemnity after a voluntary settlement, the party seeking indemnity must prove (1) that it has provided proper and timely notice to the party from which indemnity is sought;[31] (2) that it was legally liable to respond; and (3) that the settlement entered into was fair and reasonable. *Id.* For purposes of this analysis, the Court focuses on the second requirement: Ferro's legal liability to respond. Under the circumstances, this requires Ferro to show that it was answerable to the Antitrust Plaintiffs based upon actual facts showing antitrust liability relative to

merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability. *Flaugher,* 30 Ohio St.3d at 62, 507 N.E.2d 331. None of the exceptions applies in this case. In fact, pursuant to the terms of the APA, Ferro expressly declined to assume liability for pre-APA conduct by Synpro.

30. The record does not reveal any indication that Ferro sought to assert this defense. Nor does it appear that Ferro sought to dispel any impression the Antitrust Plaintiffs may have had that Ferro could have been held liable for Synpro's conduct. (*See* Defs.' Opp. to Pl.'s Mot. for Partial Summ. J., at 12–13.) The

inference to be drawn from this is that Ferro did not do so because it perceived a potential benefit from allowing that impression to persist. No such inference, however, is necessary to support the Court's decision in this matter.

31. Issues exist regarding the timeliness of the notice provided by Ferro to Cookson, the factual support for Ferro's claim, and possible prejudice to Cookson resulting from the delay. Neither party focused its summary judgment briefing on these issues. The record before the Court does not permit resolution of the notice issues. For the reasons stated herein, however, resolution of such issues is not necessary.

Synpro.[32] *See Chemstress Consultant Co., Inc. v. Cincinnati Ins. Co.,* 128 Ohio App.3d 396, 402, 715 N.E.2d 208 (9th Dist. 1998) (citing *Riverside Ins. Co. v. Wiland,* 16 Ohio App.3d 23, 26, 474 N.E.2d 371 (11th Dist.1984)) ("The duty to indemnify is based on whether there is, in fact, liability under the policy.") Thus, to obtain summary judgment, Cookson must establish that no genuine issue of material fact exists as to whether Synpro in fact violated the antitrust laws prior to the execution of the APA.[33]

In opposing Cookson's motion for summary judgment, Ferro failed to put forth any evidence establishing that Synpro in fact engaged in proscribed antitrust activity. Ferro scheduled, but later canceled, the deposition of Thomas Jennings. Jennings submitted an affidavit in support of Cookson's motion, which stands uncontroverted, stating that he took no part in any alleged conspiracy. The record is devoid of evidence implicating Synpro in any antitrust violations. Ferro was answerable to the Antitrust Plaintiffs, if at all, based solely upon its own conduct. Accordingly, Cookson's motion for summary judgment on Ferro's claim for indemnification must be granted.

### 2. Antitrust Analysis

■ Cookson unflaggingly argues that Ferro's claims in this action are barred completely because Ferro admits, as it must, that it was sued, at least in part, based upon allegations of antitrust viola-

tions committed by Ferro itself. Cookson asserts that, based upon this admission, and upon the joint and several nature of antitrust liability, Ferro faced liability for all the damages caused by the alleged conspiracy whether or not it purchased the Synpro assets through the APA and irrespective of Synpro's conduct. Accordingly, Cookson maintains that Ferro's claims fail as a matter of law. Cookson's support for this argument is *MacMillan Bloedel Ltd. v. Flintkote Co.,* 760 F.2d 580 (5th Cir. 1985). The Court's view is that the contractual analysis set forth *supra* disposes of the entirety of Ferro's claims. However, the Court will address Cookson's argument in this regard because the Court finds that it provides an independent basis mandating dismissal of the complaint, and also serves to illustrate the contractual analysis.

In *MacMillan Bloedel,* the plaintiff was sued as one of twenty-two named defendants in civil antitrust actions alleging that the defendants engaged in a conspiracy to fix prices in the corrugated container industry, which extended from January 1, 1960, through January 25, 1978. 760 F.2d at 582. MacMillan Bloedel had entered the industry in 1966. In 1972, MacMillan Bloedel purchased certain assets, including several corrugated container plants, from the Flintkote Company. *Id.* In the contract relating to the purchase, "Flintkote agreed to 'indemnify' MacMillan Bloedel 'and save them harmless from, any and all

---

**32.** Arguably, it would be impossible for Ferro to make such a showing, regardless of the contents of the underlying factual record, because the express terms of the APA precluded Ferro from taking on any antitrust liability relative to Synpro. Because the Court finds that, in any event, the record contains no evidence of antitrust violations by Synpro, the Court need not address this argument.

**33.** In order for Ferro to establish affirmatively that Cookson owed it a duty to indemnify,

in addition to setting forth conclusive facts establishing antitrust liability attributable to Synpro, Ferro also would have to show that Ferro was sued in the Antitrust Cases based upon claims arising out of Synpro's retained liabilities. As stated elsewhere in this Memorandum Opinion, the Court concludes that the claims against Ferro in the Antitrust Cases did not arise out of Synpro's retained liabilities.

liabilities, contingent or otherwise ... with respect to and arising from the operations of [those assets] by [Flintkote] prior to the closing date.'" *Id.* After the civil antitrust cases were filed, MacMillan Bloedel notified Flintkote of the lawsuits and sought indemnification, and Flintkote denied liability for indemnity and refused to participate in defending any of the lawsuits. *Id.* at 582–83. Flintkote was not named as a defendant in any of the antitrust complaints. *Id.* at 582. MacMillan Bloedel later paid out millions of dollars in settlement of the antitrust actions. *Id.* at 583. MacMillan Bloedel then sued Flintkote, asserting, *inter alia,* a claim for indemnification based upon the relevant provision of the asset purchase agreement.

The district court granted summary judgment in favor of Flintkote. Specifically, the district court found that while the contract provided for indemnification for violation of the antitrust laws, MacMillan Bloedel's claim was barred because "allowing indemnification would be contrary to the policy underlying the federal antitrust laws." *Id.* at 584. The Fifth Circuit affirmed. However, rather than agreeing with the grounds for the district court's decision, which it apparently read as invalidating all indemnity agreements relating to antitrust liability, the Fifth Circuit explained its holding in favor of Flintkote as follows:

> The amount that MacMillan Bloedel seeks to recover here was paid because, as an alleged co-conspirator, it was a joint tortfeasor, liable jointly and severally for all of the damages sustained by virtue of the conspiracy without regard to the liability of other conspirators. It would have been liable for the same amount had it never purchased any assets from Flintkote. Its liability, therefore, arose neither from Flintkote's pre-acquisition torts nor from Flintkote's breach of warranty.

*Id.*[34] The Fifth Circuit validated the district court's conclusion that the sale agreement at issue covered indemnification claims for violations of antitrust law. *Id.* The court then noted that principles of joint and several liability applied in the antitrust context. *Id.* at 585 (citations omitted). The antitrust plaintiffs alleged that MacMillan Bloedel engaged in price fixing prior to its acquisition of Flintkote's assets, but did not allege that MacMillan Bloedel was liable for Flintkote's antitrust liability as a corporate successor. *Id.* Thus, MacMillan Bloedel's only potential liability based upon Flintkote's pre-acquisition conduct would be as a coconspirator with Flintkote in the alleged price-fixing

---

**34.** In this regard, the Fifth Circuit stated that it did "not find it necessary to define the policy of the antitrust laws or to decide whether that policy would invalidate some or all indemnity agreements made in connection with the sale of a business [ ... ]." 760 F.2d at 584. Ferro points to this statement as effectively nullifying the precedential value of the decision. The Court disagrees. It appears that by this statement, the Fifth Circuit meant nothing more than that it did not intend to invalidate all contractual indemnity agreements regarding antitrust liability. Based upon the court's analysis, it is clear that it relied upon certain principles of antitrust law in reaching its decision, most notably the principle of joint and several liability. The effect of that decision was to nullify the contractual indemnity agreement at issue in the case. Thus, to the extent of this reliance, the Fifth Circuit did indeed define (or at least apply) antitrust policy, just not to the extent that would *per se* invalidate contractual indemnity agreements in the antitrust context. In addition, to the extent Ferro contends that *MacMillan Bloedel* was limited to its facts, the Court finds those facts to be identical to the facts of the instant case in all material respects, save one: the indemnification provision did not also include a provision for defense. As explained in further detail *infra,* the Court finds that the Fifth Circuit's analysis in *MacMillan Bloedel* nevertheless appropriately extends, under the circumstances, to a claim for defense.

conspiracy. *Id.* The Fifth Circuit therefore concluded that, by seeking indemnification based upon an assertion that it was sued due to Flintkote's antitrust violations which occurred prior to the asset purchase, MacMillan Bloedel, by definition, sought "to recover for liability arising from its own alleged conspiratorial activities either before or after it purchased the [Flintkote] assets." *Id.*

Applying principles of joint and several liability, the court found that MacMillan Bloedel could have been held liable for all the damages caused by all of the defendants in the underlying antitrust cases. Accordingly, the Fifth Circuit concluded that "[n]one of MacMillan Bloedel's liability, therefore arose from the operation of the [Flintkote] assets by Flintkote prior to [the asset purchase] [ ... ]". *Id.* at 585–86. Because the terms of the indemnification provision required that the claim "aris[e] from the operations of [those assets] by [Flintkote] prior to the closing date," the Fifth Circuit affirmed the district court's grant of summary judgment in favor of Flintkote on the indemnification claim.

Factually, at least with respect to Ferro's claim for indemnification, the instant case is indistinguishable from *MacMillan Bloedel.* As in *MacMillan Bloedel,* Ferro was sued as one of many named defendants in numerous suits alleging antitrust violations stemming from a price-fixing conspiracy. Cookson, like Flintkote, was not named or implicated in the underlying antitrust complaints. Approximately halfway through the alleged conspiracy, Ferro purchased certain assets from Cookson (the Synpro assets), whereupon Ferro subsequently operated the purchased assets, and Cookson exited the industry. The asset purchase agreements in both cases included provisions for indemnification of the buyer by the seller for liabilities arising from conduct of the seller prior to the transaction, including violations of the antitrust laws.

In *MacMillan Bloedel,* as in the instant case, there was no question that the allegations in the underlying antitrust actions implicated the buyer of the assets (i.e., MacMillan Bloedel and Ferro) in the antitrust conspiracy, either before or after the asset purchase. On the basis of that fact, applying principles of joint and several liability, the Fifth Circuit concluded that the liability faced by MacMillan Bloedel as a result of the underlying antitrust cases existed independent of its acquisition of assets from Flintkote, and therefore did not arise out of the pre-acquisition conduct of the seller, as was required to trigger the indemnification clause.

This Court perceives no basis upon which to distinguish *MacMillan Bloedel.*[35] Applying its holding, the Court concludes that the liability confronted by Ferro as a result of the Antitrust Cases was unaffected by its acquisition of the Synpro assets. Ferro was sued in its own right, and therefore faced joint and several liability for the full amount of damages caused by the alleged conspiracy, irrespective of Synpro's pre-acquisition conduct. The Antitrust Plaintiffs did not allege successor liability against Ferro, nor could they. Ferro's liability, therefore, did not arise out of Synpro's retained liabilities, as required by the terms of the APA.[36] Accordingly, Fer-

---

**35.** Ferro argues that *MacMillan Bloedel* is distinguishable because it seeks indemnification from Cookson, not Synpro. But in reaching its decision, which it based upon the fact that MacMillan Bloedel faced the same liability from the antitrust actions whether or not it acquired the Flintkote assets, the court's focus was on the party seeking indemnification, not the party from which the indemnification was sought. Thus, the case cannot be distinguished on this basis. Ferro, like MacMillan Bloedel, faced the same amount of liability in the Antitrust Cases whether or not it acquired the Synpro assets.

**36.** The language of the corresponding indemnification provision in *MacMillan Bloedel* ar-

ro's claim for indemnification fails as a matter of law, regardless of whether the Antiturst Plaintiffs also alleged claims against Synpro (which the Court concludes they did not).

▪ The next question is whether, as Cookson asserts, the reasoning expressed by the Fifth Circuit in *MacMillan Bloedel* extends to bar Ferro's claim for defense. Ferro correctly notes that the relevant section of the asset purchase agreement at issue in *MacMillan Bloedel* did not include provision for defense. Cookson argues, however, that the reasoning employed by the Fifth Circuit in *MacMillan Bloedel*, specifically its explanation of why the claim for indemnification did not arise out of actions of the seller, logically extends to a claim for defense under the same provision, and mandates the same conclusion.

The Court agrees with Cookson's interpretation. Ferro's claim for indemnity, i.e., the amounts it paid to settle the Antitrust Cases, did not arise out of Synpro's retained liabilities because Ferro faced the same amount of liability in the Antitrust Cases regardless of its acquisition of the Synpro assets. The same is true of the amounts Ferro expended to defend the Antitrust Cases. Ferro was sued in its own right in each of those cases. Whether or not the Antitrust Plaintiffs also alleged claims against Ferro based upon Synpro's actions prior to the APA (and the Court has concluded that they did not), Ferro was obligated to defend those actions. Thus, whether or not some portion of the claims in the Antitrust Cases was attributable to Synpro, Ferro's costs were unaffected. Accordingly, under the *MacMillan Bloedel* rationale, Ferro's defense costs did not arise out of Synpro's retained liabilities any more than did its claim for indemnity. For that independent reason, Cookson's motion for summary judgment must be granted.

The propriety of extending *MacMillan Bloedel* to a claim for defense on these facts is illustrated by examining the effect adopting Ferro's position would have. When construing a contract, a court's paramount objective is to ascertain and give effect to the intent of the parties. *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.,* 86 Ohio St.3d 270, 273, 714 N.E.2d 898 (1999). The obvious intention of the defense and indemnification provision of the APA was to insure Ferro against the risk of liabilities that might arise in the future based upon actions of Synpro which occurred before the acquisition. Ferro does not, and cannot, argue otherwise. In this case, however, Ferro attempts to shift the full amount of its defense costs, as well as its settlement costs, incurred in the Antitrust Cases to Cookson based upon the APA. Ferro wants to pay nothing; it wants Cookson to pay everything. There

guably is broader than that used in the APA. In *MacMillan Bloedel*, the seller was obligated to "indemnify" MacMillan Bloedel "and save them harmless from, any and all liabilities, contingent or otherwise . . . with respect to and arising from the operations of [those assets] by [Flintkote] prior to the closing date." 760 F.2d at 582. Here, the APA provided that "Cookson and [Synpro], jointly and severally, shall hold harmless, indemnify and defend [Ferro] and permitted successors and assigns from and against any loss, claim, cause of action or liability, cost or expense including, without limitation, fines, penalties, court costs and reasonable attorneys' fees, consultants' fees, disbursements and expenses, that arise out of" Synpro's retained liabilities. For the reasons explained herein, however, this makes no difference. Specifically, the rationale behind *MacMillan Bloedel* focuses on the joint and several nature of antitrust liability in reaching the conclusion that the liability at issue did not arise out of the seller's pre-acquisition conduct. This rationale is unaffected by the different language used to define the defense and indemnification provision of the APA.

is no legitimate argument that this is what Ferro intended to purchase and what Cookson intended to sell when they entered into the APA. Ferro was sued as a defendant in the Antitrust Cases based upon allegations relating, at least in part, to Ferro itself, and having nothing to do with Synpro. As *MacMillan Bloedel* explains, due to the nature of antitrust liability, Ferro would have sustained the same amount of expenses as a result of the Antitrust Cases whether or not it acquired the Synpro assets. Thus, to hold in Ferro's favor would bestow a massive windfall upon Ferro for which it did not bargain, a result which the Court cannot sanction.

## C. Declaratory Judgment

In the complaint, Ferro also seeks a declaratory judgment that Cookson is required to provide Ferro a defense in the antitrust actions that have not yet settled. Pursuant to the Court's analyses of the duty to defend issue as set forth *supra*, the Court concludes that Cookson owed Ferro no duty to defend any of the Antitrust Cases. Accordingly, the Court grants summary judgment in favor of Cookson, and dismisses this claim.

## III. Conclusion

For the foregoing reasons, Cookson's motion for summary judgment on all of Ferro's claims is **GRANTED**, and Ferro's motion for partial summary judgment is **DENIED.** This action is **DISMISSED** in its entirety.

**IT IS SO ORDERED.**